# GARY A. FARRELL, ESQ.
ATTORNEY AT LAW
305 BROADWAY, 14TH FLOOR
NEW YORK, NEW YORK 10007
TEL: (212) 822-1434 • FAX: (212) 822-1472
garyfesq@aol.com
GaryFarrelllaw.com

November 5, 2019

Judge LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
*Via ECF and hand delivery*

Re: U.S.A. v. Nicholas Rodriguez
18-Cr-581 (LDH)

Dear Judge Hall:

As the Court knows, this defendant was convicted after entering a guilty plea to the charge of being a Felon in Possession of a Firearm under the sole count of this indictment. Sentencing is currently scheduled for November 15, 2019, at 2:00 p.m. This letter is written pursuant to Rule 32 of the FRCP to advise the Court of several matters that the defendant will raise at the time of sentencing and to aid in the determination of an appropriate sentence.

I. **The Presentence Report**

As noted by the Government in their sentencing letter, the defense strenuously objected to the PSR Paragraphs 12, 16 & 17 regarding the 2-level enhancement for obstruction of justice and the loss of acceptance of responsibility points.[1] The obstruction enhancement should not apply and the defendant should get a two level reduction for acceptance of responsibility thereby making his adjusted offense level 12 and the sentencing guidelines range 10-to-16 months.

The defendant's argument regarding obstruction of justice is simple: he did not obstruct justice by penning a two- sentence, truthful (albeit unsworn) letter and giving it to his co-defendant's family, who came to his home to request it (Exhibit A). The letter did not falsely exculpate Crook, as it never stated Crook did not *hand* him the gun just prior to when he was arrested. Rather, he is clarifying the fact that Crook did not *sell* him the gun. I am sure the Court recalls the videotape admitted at the suppression

---

[1] The Probation Department never responded to the objection, nor did the Government, although they did address the issue in their sentencing letter.

1

hearing clearly showing Crook giving Rodriguez what turned about to be the derringer and a bag of bullets, yet Rodriguez was never observed giving him any money for it. The defendant had been drinking on the night of the arrest (vodka bottle observed in his pocket on the video) and he had earlier given the gun to his friend Crook to hold for him, however, the mother of Crook's children refused to allow him to keep it in their apartment so he promptly returned it to Rodriguez.

The Government is correct in its assertion that in his post-arrest statements to the police Rodriguez did claim that a guy named "Blaze (Crook) or Butter" sold him the gun at a liquor store (Govt. letter at 4). However, Rodriguez said this because he felt that his arrest within seconds after receiving the gun from Crook must have come as a result of Crook's cooperation with law enforcement. The Government disclosed several phone calls made while the defendant was initially in state custody prior to being released on bond in this court when the case became federal. These calls corroborate that Rodriguez believed that Crook set him up and was angry at him. Crook also made recorded calls while in state custody and neither he nor Rodriguez ever mentioned that Crook sold the gun to Rodriguez. This letter written by Rodriguez, admittedly ill-advised, served only to appease Crook's family who were at his house, per the PSR, "to intimidate him." PSR ¶21. The reality is that the letter merely set the record straight: Crook gave Rodriguez back his gun, he did not sell it to him. If Rodriquez wrote a letter stating that Crook did not give him the gun prior to his arrest, that in fact someone else did, that would be the clear cut case of obstruction of justice that the Government wants the Court to believe occurred in this case.

Additionally, the only reason that the obstruction issue has surfaced is that the defendant's domestic partner, Imeisha Padgett, reported that Crook's family visiting their apartment to the defendant's PTS officer. AUSA Navarro then promptly and properly initiated an investigation into witness tampering which included serving my client with a grand jury subpoena which he duly complied with and testified before the grand jury concerning the visits by Crook and his family. No additional charges were ever filed against either defendant. These actions by Nicholas Rodriguez are simply not consistent with intending to obstruct justice.

The defense likewise renews its argument made in the objection to the PSR, that should the Court find Nicholas Rodriguez obstructed justice it should nonetheless allow for the acceptance of responsibility adjustment. As the previously mentioned videotape of the arrest clearly showed, Rodrigues was cooperative with the police from the moment he was in their custody and admitted to possessing the gun while handcuffed in the street. Upon being returned to the precinct and advised of his <u>Miranda</u> warnings he unequivocally stated that the gun was his and he bought it to protect himself. The defendant pled guilty before Magistrate Judge Mann on July 31, 2019, and fully admitted his guilt without equivocation, he readily acknowledged that he knew as a convicted felon he was not allowed to possess a gun (Exhibit B).

The Government correctly points out that Section 3E1.1 of the Sentencing Guidelines precludes an adjustment for acceptance of responsibility when the defendant

2

has been found to have obstructed justice. There may, however, be extraordinary cases in which adjustments under both Sections 3C1.1 and 3E1.1 may apply. USSG § 3E1.1, n.4.

In United States v. Gregory, 315 F.3d 637, 640 (6th Cir. 2003), the Court reversed the district court and applied the adjustment for acceptance of responsibility notwithstanding the defendant having obstructed justice, noting that when evaluating whether a case is "extraordinary" the Court must focus on the relationship between the defendant's obstructive conduct and his acceptance of responsibility.

In this case, the alleged obstruction of justice took place several months after the defendant had already accepted responsibility by admitting his guilt to the police upon his arrest. However, when the Government asked the defendant to acknowledge that he wrote this letter claiming that Crook did not sell him the gun, he did so promptly and under oath while testifying before the grand jury. The alleged obstruction never involved any recantation or equivocation of his own guilt for possessing the firearm as a convicted felon. Finally, the defendant re-affirmed his guilt, subsequently to writing the letter, when he pled guilty before Magistrate Judge Mann in July.

In United States v. Davis, 797 F. Supp. 672 (N.D. of Indiana) (Lee, J. 1992), the district court found that despite the defendant's misconduct of misleading investigators and destroying evidence, he should receive the reduction for acceptance of responsibility. The court's rationale can be applied to the instant case:

> Despite the earlier obstructiveness of the defendant, *over the course of this case the defendant has more consistently exhibited acceptance of responsibility for his criminal conduct*. The court finds this an extraordinary case where adjustments for obstruction and acceptance of responsibility are warranted, and therefore, grants, the defendant's request for a two point reduction for acceptance of responsibility in the instant offense.

797 F. Supp. at 674. (Emphasis added).

Nicholas Rodriguez has "consistently exhibited acceptance of responsibility for his criminal conduct." From the moment of his arrest, to his videotaped interrogation, to admitting he wrote a letter at the behest of his co-defendant's family and testifying about it, through his unequivocal guilty plea, the defendant has never wavered from the fact that this was his gun which he purchased to protect himself after being recently attacked in his neighborhood. As such, he should receive a two level deduction for acceptance of responsibility.

## II. A Downward Departure is Warranted as a Result of U.S.S.G. 5H1.6,[2]

### A. Extraordinary Family Circumstances

The defendant is currently living with Imeisha Padgett, his partner since 2015. PSR¶ 44. They have a two year old son together and they are expecting another child. PSR¶ 44, Exhibit C. Additionally, Ms. Padgett has eight children from previous relationships, whose ages range from 3-to-16, who until recently had been living with them until being removed by ACS. PSR¶ 44. Ms. Padgett has written to the Court on the defendant's behalf and praised him as a "great father to our son including my other kids which is not biologically his." (Exhibit C). The defendant has proven to be a great provider as he previously worked for Red Hook Construction for nearly 20 years. PSR¶ 55, Exhibit D. His verified gross taxable income was more than $50,000 in 2016 & 2017. PSR¶ 57. After being unemployed for several months at the inception of this case, Nick now works for Alba Demolition & Carting Co. as a skilled laborer who is hopefully on the way to becoming an assistant foreman. PSR ¶52, Exhibit D.

Many of the cases that touch on this ground for a departure make the valid point that in any case there will be a certain amount of suffering for the family of a defendant who is incarcerated. To qualify for the departure there must be something truly "extraordinary." In this case, there will be potentially ten young children who would be deprived of a father—or father figure —at a time when they could really use Nick's emotional and financial support during their formative years.

In United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992), the Second Circuit upheld a downward departure based upon extraordinary family circumstances. The circumstances in Johnson were arguably more compelling than in in this case. That defendant was faced with raising and supporting three children and an infant grandchild by herself. Id. However, the rationale utilized by the Court in Johnson is nonetheless applicable to this case. The Court stressed that the departure was "not on behalf of the defendant herself, but on behalf of her family." Id. Likewise, in this case the departure is primarily for the benefit of the defendant's young son, his soon to be born child, and Ms. Padgett's eight other children who are also largely dependent on the defendant.

## III. 18 U.S.C. § 3553(a)

### 1. The History and Characteristics of the Defendant

Nicholas Rodriguez was raised by a single mother who was plagued by the demons of drug and alcohol abuse and he was still a teenager when she died in 1989. PSR¶ 38, 42. Shortly after her death, Nick turned to the streets and to the drug trade to

---

[2] The defense would also rely on this argument as it impacts sentencing pursuant to 18 U.S.C. 3553(a).

attempt to survive. From 1990-to-1994 the defendant was convicted of four separate low-level drug sales for which he served prison sentences. PSR¶s 29-32. For example, the felony complaint from his last case in 1992 shows clearly that Nick's role was actually one of a "steerer" in that he and one other person directed the undercover officer to yet another person (McCord) who made the exchange with the undercover officer (Exhibit D). The lab report on that case showed that three men were working together to sell two *grains* (.064 grams) of cocaine (Exhibit E). Those actions resulted in a sentence of two-to-four years in prison. PSR¶ 32.

Nicholas Rodriguez left New York State prison for the last time in 1994 and he resolved to change and live a law-abiding life away from narcotics. He did that until his arrest on this case in September of 2018. PSR¶ 42. As noted above, for the majority of that 24 year period Nick worked at Red Hook Construction. PSR¶ 55. Nick was married throughout that time, although he and his wife lived apart for much of it and no longer speak, although they remain legally married. PSR¶ 43. Nick helped raise and provide for his son from that union, Nicholas Jr., who signed the bond as a suretor in this case and now has his own family. PSR¶ 43, p.1 of PSR.

The defendant's personal circumstances and current family situation are noted above. In addition to his current life partner, Ms. Padgett, Nick has a very good relationship with his two younger sisters, Kathy and Jennifer, who are both mothers themselves of three children and are in stable relationships. Both sisters and one of their boyfriends, Angel Sanchez, wrote to the Court praising Nick for his positive demeanor, strong work ethic and love of his family (Exhibit F).

Finally, it has been very difficult for the defendant to be living apart from his children. He recognizes that his negligence caused his young son to be injured and he vows to do better as a parent. PSR¶ 44. However, rather than rail against the the system, Nick has chosen to work with ACS by attending all supervised visitation sessions and by attending "Reborn for New Life" through St. Vincent's Services, a parenting program since July 26, 2019. He has been "compliant and consistently attending" these sessions per his case planner, Anna Kasagawa (Exhibit G). The supervised visitation with his young son have been "consistent, positive and age-appropriate." The defendant and Ms. Padgett are cautiously optimistic that based on their progress and work with ACS, that all of the children will be returned to them on a full-time basis in the near future. The Housing Authority is finally doing much needed repair work on their apartment so the hope is that it will be ready when the children are returned.

### 2. The Need for the Sentence Imposed

There are several additional factors listed under 18 U.S.C. § 3553(a) (2) that the Court must consider in order to "impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing." Some of these factors have already been addressed and the defense will seek to address the remaining ones in combination with each other.

### 3. The Nature of the Crime

There can be no question that possessing a firearm is a serious transgression of our laws. However, as stated above, the defendant accepted responsibility for his role in this crime from the moment of his arrest. Additionally, the type of gun possessed, a two-shot derringer, should be taken into account as a mitigating factor. One only needs to pick up a newspaper to hear about a tragic shooting at a park or a crowded street wherein an innocent young person or elderly person is struck by a stray bullet. These tragedies are caused by semi-automatic pistols being discharged multiple times. By contrast, this type of gun can only be practically used to defend oneself (or attack another) in close quarters. Additionally, the defendant stated during his videotaped interrogation to the police that he was recently jumped by two men and he was further told he "would be hurt." He admitted to purchasing the gun only for self-defense purposes. PSR ¶ 9. See United States v. Levy, 2017 U.S. Dist. LEXIS 162442, *13 (Weinstein, J.) (Court held that, "possession of the gun has some justification—here, enemies were out to hurt defendant and those he was close to").

### 4. Specific and General Deterrence

Finally, the defendant is now 47 years old and as such is less likely to re-offend than a younger man. Several courts have pointed out that the Guidelines fail to take into account the "inverse relationship between age and recidivism." See United States v. Hodges, 2009 WL 36231 (E.D.N.Y.) (Sifton, J. 2009) (court noted that defendant at age 43 was substantially older than most drug dealers and would "take into account his age in fashioning his sentence").

As noted above, and in the PSR, the defendant is part of a close-knit family who are very supportive of him, notwithstanding his criminal actions. PSR¶s 39, 42, 44. The fact that Nick has several dependents, including a newborn in the very near future, relying on him make it more likely that he will now be completely deterred from committing further crimes as the consequences for his family would be disastrous were he to be re-arrested. Furthermore, the public can be adequately protected by the defendant being supervised for the next few years as part of post-release supervision or a probationary sentence. PSR ¶s 63-65. The defendant has lived a law abiding life since his arrest in September of last year and he has adjusted favorably to pre-trial supervision over that time period. He has an outstanding opportunity for long-term gainful employment at this current place of employment. PSR¶ 52. There is nothing in his background that suggests he harbors violent propensities or is in any way a danger to the community.

The defense concedes that some courts have taken the view that, "in gun cases, judges may take into account the impact of the type of crime committed by the defendant in the particular community in which it was committed." See United States v. Paul, 2006 U.S. Dist. LEXIS 31198 *11 (E.D.N.Y.) (Sifton, J.) In Paul, the district court held that, "[G]iven the particular dangers of gun trafficking in the New York metropolitan area as

6

described above, the need for deterrence is heightened." 2006 U.S. Dist. LEXIS 31198 *18.

In contrast to the defendant in Paul who transported 17 firearms into Brooklyn from Pennsylvania, most of them semi-automatic pistols, Nick Rodriguez possessed one two-shot derringer that he purchased after being beaten up and threatened. I respectfully submit that in this gun case the need for deterrence is not heightened. In United States v. Marsh, 820 F. Supp. 2d 320 (E.D.N.Y.) (Weinstein, J. 2011), Judge Weinstein opined on general deterrence for fun gun cases in a manner this Court may find persuasive:

> Considering the nature of the fraud perpetrated by the defendants, general deterrence is of great importance. Unlike defendants in gun and drug cases, who often act without reflection, individuals who engage in financial fraud can, at least in theory, be deterred by a threat of substantial penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.

820 F. Supp.2d at 330.

### IV.    Recommendation

The Court is well aware that the Supreme Court and the Second Circuit have held that, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008); See also Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558; Rita v. United States, 551 U.S. 338 (2007). When arriving at the proper sentence the court may not presume the Guidelines sentence is reasonable, but "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189.

For all of the above reasons, Nicholas Rodriguez is requesting that the Court impose a significantly more lenient sentence than the presumptive guideline range sentence. The defendant requests that the Court fashion a sentence that would allow him to continue to work and support his young children who rely upon him for financial and emotional support. If the Court determines that there should be a sentence of incarceration, the defendant respectfully requests that he be allowed to self-surrender in February of 2020. Finally, the defendant would likewise request that the Court recommend that the Bureau of Prisons place the defendant in a facility as close to his home as possible to facilitate family visits.

Respectfully submitted,

Gary Farrell
Attorney for Nicholas Rodriguez

cc: AUSA Francisco Navarro (via email & ECF)
Probation Officer Jaime Turton (via email)